# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| B.M.D., a minor, by and through his father, | ) | |
| MARVIN DICKERSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.: 3:07-CV-73 |
| | ) | (VARLAN/SHIRLEY) |
| KNOX COUNTY, TENNESSEE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This civil action is before the Court on Defendants Winston Ragon and Allen May's Motion for Summary Judgment [Doc. 92; *see also* Docs. 93; 128]; Defendant Knox County's Motion for Summary Judgment [Doc. 94; *see also* Docs. 95; 126; 127]; and Plaintiffs' Motion for Partial Summary Judgment [Doc. 97; *see also* Docs. 102; 129; 130]. Plaintiffs responded in opposition to defendants' motions [Doc. 133], defendants filed replies [Docs. 135; 136]; and plaintiffs filed a sur-reply [Doc. 137]. Likewise, defendants responded in opposition to plaintiffs' motion [Docs. 131; 132], and plaintiffs filed a reply [Doc. 134]. The Court has carefully considered the pending motions, along with the parties' briefs and other relevant filings. For the reasons set forth herein, Defendants Winston Ragon and Allen May's Motion for Summary Judgment [Doc. 92] and Defendant Knox County's Motion for Summary Judgment [Doc. 94] will be granted in part and denied in part; and Plaintiffs' Motion for Partial Summary Judgment [Doc. 97] will be denied.

## I. Relevant Facts

Plaintiff B.M.D., Dale L., Justin J., and Justin F. were high school students at Farragut High School at all times relevant to this case. In early 2006, Dale L. gave Justin J. and Justin F. some counterfeit ten dollar bills that he made at home with a scanner. Justin F. used one of the counterfeit bills at the Farragut High School cafeteria in early February 2006. On February 2, 2006, when Sandra Harper, the cafeteria manager at Farragut High School, brought a deposit to First Tennessee Bank on Campbell Station Road, Brandi McClean, a teller at the bank, received the deposit and discovered the counterfeit ten dollar bill. Ms. Harper told Ms. McClean that she did not know the origin of the bill, and Ms. McClean memorialized this in a report for the Secret Service.

Mr. Babula Nayee is the owner of the Sugu Food Mart at 2010 North Broadway in Knoxville, Tennessee. On or before February 6, 2006, someone used a counterfeit ten dollar bill with the same serial number as the one used at Farragut High School at the Sugu Food Mart. Mr. Nayee did not realize the bill was counterfeit at the time he received it and the store's security cameras were not operational at the time it was passed.

Justin J. passed two of the counterfeit bills to two different students. One of those students was Bryan C. The other was plaintiff B.M.D. Justin J. passed the bill to B.M.D. by asking a group of students if anyone had change for a ten dollar bill. B.M.D. responded that he did and he gave Justin J. two authentic five dollar bills in exchange for the counterfeit ten dollar bill. B.M.D. did not know the ten dollar bill Justin J. gave him was counterfeit at that time.

2

On February 28, 2006, B.M.D. used the counterfeit ten dollar bill to pay for his lunch in the Farragut High School cafeteria. Cynthia Stevens, the cashier who took the bill, marked it with a counterfeit pen and it "turned out to have a black dot," revealing that it was counterfeit. Ms. Stevens used the counterfeit pen on the bill B.M.D. gave her because, after the first counterfeit bill was passed, cafeteria workers followed a procedure of randomly marking every fifth ten dollar bill. She did not suspect that this bill in particular was counterfeit from its appearance prior to using the pen. Ms. Stevens then took B.M.D. to her manager, Sandra Harper. Ms. Harper questioned B.M.D. about the bill.

B.M.D. was next questioned by Dwayne Simmons, an assistant principal. B.M.D. told Mr. Simmons that he did not know that the bill was counterfeit and, at that time, he was not sure where he had obtained the bill. B.M.D. told the cafeteria staff and Assistant Principal Simmons that he could have gotten the bill from several different sources in the course of receiving and spending money in the days leading up to his use of the bill in the cafeteria, to include perhaps his mother, a store, a friend, or the bank. After B.M.D. provided this information, he was allowed to eat lunch. While eating lunch, he remembered the exchange with Justin J. and that Justin J. had given him a ten dollar bill. B.M.D. questioned Justin J. later in the day about whether Justin J. knew that the bill was counterfeit. Justin J. denied knowing that it was counterfeit and stated that he received the bill from a friend.

Ms. Harper took the counterfeit bill to First Tennessee Bank with the day's deposit on February 28, 2006. She turned over the counterfeit bill to the bank because she felt that it was her job to do so. Teller Brandi McClean prepared a counterfeit note report for the

Secret Service. The next day, March 1, 2006, B.M.D. reimbursed the school cafeteria for his lunch.

Greg Pinkerton, Knox County School Security Officer, spoke to Ms. Harper regarding the incident. On March 2, 2006, Mr. Pinkerton contacted the Knox County Sheriff's Office due to the potential violation of the law that could not be handled at the school level. Defendant Winston Ragon, a deputy with the Knox County Sheriff's Department, responded to the call. Mr. Pinkston made defendant Ragon aware of the fact that two counterfeit bills had been passed at the F.H.S. cafeteria, and that he was turning the matter over to defendant Ragon.

Defendant Ragon went to Farragut High School to investigate the incident. He stated that spoke to both Ms. Stevens and Ms. Harper about the incident. However, Ms. Stevens stated that she was never interviewed by defendant Ragon. Ms. Harper stated that she spoke to defendant Ragon briefly about the incident but she did not remember identifying B.M.D. as the student who passed the note on February 28, 2006 and she specifically told defendant Ragon that she did not have any idea who passed the counterfeit note on February 2, 2006.

Defendant Ragon also spoke with Ms. McClean, the bank teller, and he obtained the bank's paperwork regarding the counterfeit notes. He then told a principal that he would like to speak to B.M.D. the next day. However, when he arrived at the school the next day, he was informed that B.M.D. had called in sick and was not at school.

On Friday, March 3, 2006, defendant Ragon went to the office of Secret Service Special Agent Brian Northcutt. Defendant Ragon obtained two bills from Agent Northcutt;

4

one that was passed at Farragut High School on February 2, 2006, and one that was passed at the Sugu Food Mart on February 6, 2006. Defendant Ragon returned to Agent Northcutt's office on March 6, 2006 and obtained the bill B.M.D. passed in the cafeteria on February 28, 2006. All of the counterfeit bills had the same serial number.

On the next school day, March 6, 2006, B.M.D. was called to the principal's office by Principal Michael Floyd Reynolds. Principal Reynolds and Assistant Principal Mike Carroll questioned B.M.D. about the counterfeit bill and asked him to write out a statement. In his statement, B.M.D. wrote that he received the bill from another student. The principals also questioned Justin J. and Justin J. confirmed that he gave B.M.D. a counterfeit ten dollar bill in exchange for two fives. Assistant Principal Bill New made a notation on the bottom of B.M.D.'s written statement regarding Justin J.'s confirmation.

Principal Reynolds called defendant Ragon to come into his office. By the time defendant Ragon arrived, B.M.D. who was there with his mother, had already made his written statement. Principal Reynolds provided B.M.D.'s statement to defendant Ragon as soon as he arrived. Defendant Ragon questioned B.M.D. and then informed him and his mother that because he had been called to the school, he was required to prepare a report and forward it to the Attorney General's office and that the Attorney General's office would make a determination about whether to file charges.

Defendant Ragon prepared a written report of his investigation. The initial portion of his report, dated March 2, 2006, states in part,

> [T]he cafeteria manager and the cashier (Harper & Stevens) advised they had received two (2) counterfeit bills from the same F.H.S. student [B.M.D.]. He had presented one on 02-02-06; and the other on 02-28-06. When questioned by Harper, [B.M.D.] first claimed to have received them from a bank; then from his mother; then from an unknown store."

[Doc. 101-5.] Defendant Ragon supplemented his report on March 6, 2006, to reflect his meeting with B.M.D. In regard to B.M.D.'s statements, the report states,

> [B.M.D.] admitted he had attempted to use one of the bills in the school cafeteria on 02-28-06; but he denied that he knew it was counterfeit. He also denied using another one in the cafeteria on 02-02-06; or presenting one at the Sugu Food Mart on 02-06-06. [B.M.D.] stated the only counterfeit bill he possessed was one he had received from another student when he had exchanged 2 five-dollar bills for the $10.00 bill.

[*Id.*]

Defendant Ragon forwarded his report, its supplements, B.M.D.'s written statement, and other information gathered during the investigation to defendant Alan May, the liaison officer with the Sheriff's Department assigned to Juvenile Court. There is some dispute between the parties over what happened next in the process of obtaining a Juvenile Petition, the charging document used in regard to juveniles, in regard to B.M.D.'s case.

Defendants state that it is defendant May's role to collect, log, and forward the investigation report to the Attorney General's Office. Defendants state that the Attorney General's Office then decides whether an individual juvenile is to be charged with a violation of law. Assistant Attorney General Debra Malone confirmed that the decision to bring a petition is made by her office and the officers with the Knox County Sheriff's Department do not have any choice whether the petition is issued or not. Malone Dep. 28-29, Nov. 28, 2007. According to defendants, if the Attorney General's office decides to go forward and

6

institute a charge, Juvenile Court intake workers prepare a Juvenile Petition. The Juvenile Petition is then presented to defendant May for his signature. Defendants assert that this process was followed as to B.M.D., and after the Attorney General's office decided to prosecute B.M.D., Juvenile Court intake workers prepared the petition.

Plaintiffs state that the decision to charge B.M.D. was not subject to advance approval by the District Attorney General's Office. Plaintiffs state that as of February and March 2006, juvenile delinquency petitions in which the alleged criminal conduct occurred on school grounds were not approved by the District Attorney General's Office in advance. Assistant District Attorney Mary Ward stated that when alleged criminal conduct occurred on school grounds, normally someone from the school would come in a meet with someone in intake and her office would not be involved with the decision about a petition. Ward Dep. 11-12, May 14, 2008. Plaintiffs state that an offense report that is approved for charging and prosecution by the District Attorney General's Office will contain the initials of the approving prosecutor but the report relating to B.M.D. does not contain any approving initials.

Both parties agree that defendant May signed a Juvenile Petition on March 22, 2006, which states,

> Your petitioner, Knox County Sheriff's Office respectfully represents to the Court on information and belief that [B.M.D.], a child now within Knox County and 16 years of age, is delinquent by T.C.A. 39-14-115 Criminal simulation within the meaning of the law of the State of Tennessee in that said child within Knox County, Tennessee, on or about February 2, 2006 and 2-28-06 did pass 2 counterfiet [sic] $10 dollar bills in the Cafteria [sic] at Farragut High School.

7

[Doc. 101-6.] Defendant May states that it is not his job to review Juvenile Petitions for accuracy. However, Assistant District Attorney Debra Malone stated that it was defendant May's responsibility to review the petition for accuracy before swearing under other that it was accurate. Additionally, defendant May's signature is notarized with a statement that he "makes oath that the statements herein are true, to the best of his/her knowledge and belief." [*Id.*]

After defendant May signed the petition, he informed defendant Ragon that it was on file. Defendant Ragon stated that after he learned a Juvenile Petition was on file, it was his duty to serve the petition by taking B.M.D. into custody. Defendant May disagreed slightly, stating that sometimes when felonies are charged, parents are allowed to bring their minors down for booking. Knox County Juvenile Court probation officer, Amanda Latham, stated that defendant May told her he was going to call B.M.D.'s mother and tell her that B.M.D. needed to come in to be booked.

On March 31, 2006, defendant Ragon called Farragut High School and informed the principals that he would be coming to the school to take B.M.D. into custody. School staff brought B.M.D. to the principal's office. Defendant Ragon arrived at the office, handcuffed B.M.D., and took B.M.D. to his squad car. Defendant Ragon drove B.M.D. to the Knox County Juvenile Detention Center, where he was fingerprinted, photographed, subjected to a urine test, and placed in a holding cell. A few hours later, Victoria Dickerson, B.M.D.'s mother, posted bail.

B.M.D.'s juvenile court trial was originally scheduled for October 10, 2006 and later continued until November 13, 2006. In anticipation of trial, Justin J. was served with a subpoena on October 12, 2006. After the subpoena was served, defendant May received two phone calls from Justin J.'s mother because she was concerned that her son might be involved in some incident. Justin J.'s parents then brought him to defendant May's office for questioning. Defendant May took Justin J.'s statement, in which he stated that he gave B.M.D. a counterfeit ten dollar bill and he did not believe that B.M.D. knew that it was fake. Upon receiving this statement, defendant May went to the Attorney General's office and met with Assistant Attorney General Malone. Ms. Malone decided to dismiss the case against B.M.D. There was no further investigation involving the counterfeit bills passed at Farragut High School and the Sugu Food Mart.

Defendant Ragon stated that he acted at all times in a manner consistent with Knox County Sheriff's Department's policies, procedures, customs, standard practices, and training with regard to investigations and arrests. Defendant May stated that he followed the custom and practice of the Sheriff's Department in handling Juvenile Petitions.

## II.     Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." The burden of establishing there is no genuine issue of material fact lies upon the moving party. *Celotex Corp. v. Catrett*, 477 U.S.

9

317, 330 n.2 (1986). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.* To defeat a motion for summary judgment, the opposing party "may not rely merely on allegations or denials in its own pleading; rather, its response must–by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e).

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson*, 477 U.S. at 249. Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

## III. Analysis

### A. False Arrest Under § 1983

Plaintiffs allege that defendants are liable for damages pursuant to § 1983 because Ragon arrested him without probable cause. Under the Fourth Amendment, an officer must have probable cause to legally arrest a person suspected of committing a crime. U.S. Const. amend. IV; *Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003).

10

A facially valid arrest warrant is a complete defense to a constitutional claim for false arrest or false imprisonment unless the warrant is so lacking in indicia of probable cause as to render official belief in its existence unreasonable. *Voyticky v. Vill. of Timberlake*, 414 F.3d 669, 677 (6th Cir. 2005) (citation omitted); *Mills v. City of Barbourville,* 389 F.3d 568, 577 (6th Cir. 2004). The requirement of a judicially-secured arrest warrant means that it must have been issued by a neutral and detached decision-maker. *See United States v. Hodson*, 543 F.3d 286, 292 (6th Cir. 2008); *see also Shadwick v. City of Tampa*, 407 U.S. 345, 347 (1972).

Based upon the record now before the Court, there are facts in dispute, which preclude the Court from finding that the Juvenile Petition relied upon by defendant Ragon was issued by a neutral and detached decision-maker. Though there is some dispute over the practice for procuring a Juvenile Petition, neither party argues that it was issued after consideration by a neutral and detached decision-maker. Defendants argue that the decision to charge a juvenile is made by the Knox County Attorney General's office, a petition is then drafted by a Juvenile Court intake worker who then sends it back to the liaison officer in the Knox County Sheriff's Office for his signature. Plaintiffs deny that the District Attorney General's Office made a charging decision in this case but note that defendant May signed the petition and swore to the facts contained therein. Given that there are facts in dispute over who reviewed the allegations and issued the Juvenile Petition, the Court cannot determine that it was the equivalent of a facially valid warrant issued by a neutral and detached magistrate.

11

Even without a valid warrant, an officer can legally arrest an individual if he has probable cause to believe that the individual committed, was committing, or was about to commit a criminal offense. "Probable cause requires only the probability of criminal activity not some type of prima facie showing." *Crockett*, 316 F.3d at 580. Probable cause necessary to justify an arrest exists when, based upon the facts and circumstances within the officer's knowledge at the moment of the arrest, a prudent person, or one of reasonable caution, would conclude that the arrestee had committed, was committing, or was about to commit a criminal offense. *Wilson v. Morgan*, 477 F.3d 326 (6th Cir. 2007) (citations omitted). "The probability of criminal activity is assessed under a reasonableness standard based on an examination of all facts and circumstances within an officer's knowledge at the time of the arrest." *Id.*; *see also Lyons v. City of Xenia*, 417 F.3d 565, 573 (6th Cir. 2005) (citation omitted). In a § 1983 action, the existence of probable cause is a jury question, unless there is only one reasonable determination possible. *Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003); *Crockett*, 316 F.3d 571, 581 (6th Cir. 2003).

Here, there are material facts in dispute which require the Court to submit the issue of probable cause to the jury. B.M.D. was arrested for criminal simulation in violation of Tennessee Code Annotated § 39-14-115. The relevant portions of § 39-14-115 state,

(a)    A person commits an offense of criminal simulation who:

    (1)    With intent to defraud or harm another:

        (A) Makes or alters an object, in whole or in part, so that it appears to have value because of age, antiquity, rarity, source, or authorship that it does not have;

12

(B) Possesses an object so made or altered, with intent to sell, pass, or otherwise utter it; or

(C) Authenticates or certifies an object so made or altered as genuine or as different from what it is;

\*\*\*

(b) A person possessing, with knowledge of its character:

\*\*\*

(2) Any instrument, apparatus, or contrivance designed, adapted or used for commission of any theft of property or services by fraudulent means, violates this section and is subject to the penalties set forth in subsection (c).

Plaintiffs admit that B.M.D. possessed and used a counterfeit ten dollar bill to purchase his lunch in the school cafeteria but they assert that B.M.D. did not know the bill was not authentic until after Ms. Stevens marked it with the counterfeit pen. Plaintiffs argue that because there is no evidence that B.M.D. had either an "intent to defraud or harm another" or knowledge that the bill was "designed, adapted or used for commission of any theft of property or services by fraudulent means," the *mens rea* element was lacking for a finding of probable cause.

"Knowledge or belief of the counterfeit character of the money is an essential element of the crime of passing counterfeit money." *Marson v. United States*, 203 F.2d 904, 906 (6th Cir. 1953). The simple act of possessing and passing counterfeit money without more does not give rise to a legitimate inference of guilty knowledge that the money is counterfeit. *See United States v. Releford*, 352 F.2d 36, 39 (6th Cir. 1965). However, evidence that the person passed counterfeit currency on multiple occasions, close in time, and under the similar

13

circumstances can provide an inference of knowledge. *Id.*; *Powers v. State*, 23 Tenn. 274 (1843); *Peek v. State*, 21 Tenn. 78 (1840).

Thus, evidence that B.M.D. passed a counterfeit bill on more than one occasion, close in time, and under the same circumstances could cause a prudent person to conclude that B.M.D. had the *mens rea* required for criminal simulation. Defendant Ragon's report states that the cafeteria worker and manager told him that they received two counterfeit bills from the same student, B.M.D., one on February 2, 2006 and one on February 28, 2006. [Doc. 101-5.] Defendant Ragon's report acknowledges that B.M.D. denied passing the counterfeit bill in the cafeteria on February 2, 2006. [*Id.*] Additionally, the cafeteria cashier and manager state that they did not tell defendant Ragon that B.M.D. passed the counterfeit bill more than once. *See* Harper Dep. 15, Nov. 27, 2007. During his deposition on August 6, 2007, defendant Ragon admitted that he knew that the cafeteria workers "couldn't say for sure with certainty whether or not it was [B.M.D.] that handed that bill" on February 2, 2006. Ragon Dep, 68, Aug. 6, 2007.

Although plaintiffs argue that defendant Ragon intentionally or negligently misstated the number of occasions upon which B.M.D. passed the bills based upon the evidence in the record, the Court would have to weigh the credibility of defendant Ragon against the credibility of the cafeteria staff in order to determine if defendant Ragon intended to or recklessly misstated to facts. Though defendant Ragon later admitted to having knowledge that the cafeteria workers did not know who passed the counterfeit bill on February 2, 2006, it is not clear that defendant Ragon has this knowledge at the time he arrested B.M.D. If, at

14

the time of B.M.D.'s arrest, a reasonably prudent person with the knowledge defendant Ragon possessed would have believed that B.M.D. passed a counterfeit bill in the cafeteria on more than one occasion, knowledge of the counterfeit character of the bills and intent could be inferred. Accordingly, there are material facts in dispute in regard to whether a prudent person would conclude that B.M.D. had the *mens rea* required for criminal simulation, and, accordingly, whether there was probable cause to arrest B.M.D. Thus, summary judgment is inappropriate on this issue and it must be submitted to the jury.

### B.    Malicious Prosecution Under § 1983

Plaintiffs allege that defendants are liable for malicious prosecution pursuant to § 1983. Malicious prosecution claims under the Fourth Amendment encompass such claims as wrongful investigation, prosecution, conviction, and incarceration. *Barnes v. Wright*, 449 F.3d 709, 717 (6th Cir. 2006) (citing *Thacker v. City of Columbus*, 328 F.3d 244, 259 (6th Cir. 2003). "[A] police officer can . . . be held liable for requesting a warrant which allegedly led to a false arrest if he stated a deliberate falsehood or acted with a reckless disregard for the truth. Proof of negligence or innocent mistake is insufficient." *Ahlers v. Schebil*, 188 F.3d 365, 373 (6th Cir.1999) (citation and internal quotations omitted). The lack of thoroughness in an investigation might support an inference of negligence, but it is not enough to show knowing or intentional behavior. *Ahlers*, 188 F.3d at 373-74. Additionally, once an officer determines that probable cause exists, he is under no obligation to continue the investigation but may instead pursue the arrest of the suspect. *Klein v. Long*, 275 F.3d 544, 549 (6th Cir. 2001).

Plaintiffs allege that defendant Ragon either intentionally or recklessly misrepresented the number of occasions on which B.M.D. passed counterfeit currency in the cafeteria. Although defendant Ragon's report indicates that Ms. Stevens and Ms. Harper told him that they received counterfeit bills from B.M.D. on two occasions and Ms. Stevens and Ms. Harper deny telling him this, that is not enough for the Court to conclude that he made any misstatement of fact deliberately or recklessly. Additionally, defendant Ragon included within his report B.M.D.'s version of the facts, in which B.M.D. denies having passed the counterfeit bills on February 2, 2006 in the cafeteria and on February 6, 2006 at the Sugu Food Mart. Though this does not prove defendant Ragon's honesty, it does show that he included information in his report suggesting that B.M.D. only passed a counterfeit bill on one occasion. In light of the evidence in the record, the Court cannot determine on the undisputed facts whether Officer Ragon deliberately included false information in his report or acted with reckless disregard for the truth and thus, this issue must be submitted to the jury.

### C. Fourteenth Amendment Due Process

Plaintiffs argue that B.M.D.'s constitutional rights to notice and due process were violated by an insufficient Juvenile Petition. Under Tennessee law, a juvenile petition must set forth:

> (1) The facts that bring the child within the jurisdiction of the court with a statement that it is in the best interest of the child and the public that the proceeding be brought and, if delinquency or unruly conduct is alleged, that the child is in need of treatment or rehabilitation;

(2) The name, age and residence address, if any, of the child on whose behalf the petition is brought;

(3) The names and residence addresses, if known to petitioner, of the parents, guardian or custodian of the child and of the child's spouse, if any; and

(4) If the child is in custody and, if so, the place of detention and the time the child was taken into custody.

Tenn. Code Ann. § 37-1-120. Plaintiffs allege that the petition was insufficient because it fails to state sufficient facts to establish probable cause that B.M.D. committed criminal simulation in violation of Tennessee Code Annotated § 39-14-115, specifically, it does not allege facts to meet the *mens rea* element.

The petition states that B.M.D. passed two counterfeit ten dollar bills in the cafeteria at Farragut High School on February 2, 2006 and February 28, 2006. [Doc. 101-6.] As stated above, evidence that a person possessed counterfeit currency on multiple occasions, close in time, and under the same circumstances can provide an inference of knowledge. *United States v. Releford*, 352 F.2d 36, 39 (6th Cir. 1965); *Powers v. State*, 23 Tenn. 274 (1843); *Peek v. State*, 21 Tenn. 78 (1840). Thus, the petition properly states facts in support of each of the elements necessary to allege a violation of criminal simulation under Tennessee law, including an inference of the *mens rea*, and therefore, the petition is not insufficient on its face. *See* Part III.A., *supra*. Thus, plaintiffs' claim for a violation of B.M.D.'s constitutional rights to notice and due process on the basis of the sufficiency of the petition must fail.[1]

_____

[1]The Court recognizes that in other portions of the pleadings, plaintiffs have argued that Officer Ragon deliberately included false information in his report regarding the number of instances that B.M.D. passed counterfeit bills. However, that argument is addressed in regard to plaintiffs' claim for malicious prosecution in part III.B, *supra*, and not here.

## D. Fourteenth Amendment Equal Protection

Plaintiffs claim that defendants violated B.M.D.'s right to equal protection through selective investigation, arrest, and charging of B.M.D. when similarly situated individuals of a different race were treated differently. In order to establish a violation of the Equal Protection Clause, a plaintiff must prove that he was purposefully discriminated against due to his membership in a protected class. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *Henry v. Metro. Sewer Dist.*, 922 F.2d 332, 341 (6th Cir. 1990). Specifically, a § 1983 equal protection claim based upon selective enforcement requires a plaintiff to demonstrate the following three elements:

> First, [an official] must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. Second, [the official] must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.

*Gardenhire v. Schubert*, 205 F.3d 303, 319 (6th Cir. 2000) (quoting *United States v. Anderson*, 923 F.2d 450, 453 (6th Cir. 1991)). In other words, plaintiffs are required to show both a discriminatory purpose and a discriminatory effect. *Gardenhire*, 205 F.3d at 318. "A claimant can demonstrate discriminatory effect by naming a similarly situated individual who was not investigated." *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 534 (6th Cir. 2002). Co-conspirators are not similarly situated if their role in the commission of an offense was significantly different. *See Keene v. Mitchell*, 525 F.3d 461, 464-65 (6th Cir. 2008) (noting that defendant's white co-conspirator in a murder case was

18

not similarly situated, because, unlike defendant, she was not the triggerman for any of the murders, she was only charged with two of the five murders, and her role was relatively minor).

On the undisputed facts, plaintiffs' claims for violations of B.M.D.'s rights to equal protection fail because the undisputed facts do not show that B.M.D. was singled out from another similarly situated person based upon his race. B.M.D. is African American while the other three individuals, J.J., J.F. and D.L., are Caucasian. The facts demonstrate that B.M.D., J.J., J.F., and D.L. were each involved with the counterfeit bills at issue in this case in some way. However, based upon the undisputed facts in the record, B.M.D. was the only student who was identified to school officials and defendant Ragon as someone who passed a counterfeit bill in the cafeteria. Thus, B.M.D. was not similarly situated as the other students, and, on the undisputed facts, plaintiffs' equal protection claims fail.

### E.    Failure to Train Under § 1983

Defendants Ragon and May, in their individual capacities, move for summary judgment on plaintiffs' claims for failure to train stating that they had no duty to train employees. Plaintiffs did not respond to defendants Ragon and May's arguments on this issue and therefore, the issue is deemed conceded. Accordingly, summary judgment is granted in favor of defendants Ragon and May, in their individual capacities, as to plaintiffs' claims for failure to train.

Defendant Knox County also moves for summary judgment on plaintiffs' claims of failure to train. An employer can only be held liable pursuant to § 1983 for failure to train

19

"where the failure to train amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Because of the limits of municipal liability, a municipal employer can only be held liable for failure to train if the training is inadequate and such inadequate training can justifiably be said to represent city policy. *Id.* at 390.

If it were Knox County's policy to train its officers to arrest juveniles without probable cause or to make misrepresentations in their reports, this policy would constitute deliberate indifference to the rights of those arrested. Defendant Ragon stated that he acted at all times consistent with the customs and policies of the Knox County Sheriff's Department. Ragon Dep. 31-33, Aug. 8, 2007. Defendant May also stated that he signed juvenile petitions without reviewing them for probable cause pursuant to the standard practices of the Knox County Sheriff's Department. Thus, because both officers state that they acted in compliance with County policies during all actions related to the arrest of B.M.D., and there is a genuine issue of material fact in regard to the existence of probable cause for B.M.D.'s arrest and whether defendant Ragon intentionally or reckless made a misrepresentation in his incident report, summary judgment in not appropriate on this issue in regard to defendant Knox County.

## F.     Municipal Liability

Defendant Knox County argues that plaintiffs cannot state any claim against it because plaintiffs cannot show the existence of a official policy or custom, which deprived plaintiffs of a constitutional right. In order to hold a municipality liable for a First

20

Amendment retaliation claim, the adverse action must have occurred as part of an official policy or custom. *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). Such a policy need not be written. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986).

The County asserts that to the extent that any violations of B.M.D.'s constitutional rights occurred, such action was not pursuant to an official policy. The County states that its official policies are that arrests are to be made with probable cause, and that the Constitution is to be supported by its officers. However, as discussed above, there are genuine facts in dispute as to whether defendants Ragon and May violated any of the B.M.D.'s constitutional rights. Both defendant Ragon and defendant May stated that they acted in conformance with the policy and practice of the Knox County Sheriff's Department at all times. Thus, there is a genuine issue of material fact as to whether the officers violated any of B.M.D.'s constitutional right pursuant to an official policy or custom of Knox County.

### G.   Qualified Immunity

The individual defendants argue that they are entitled to qualified immunity. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*

*v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity does not shield public officials from liability for violating constitutional rights which are clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The first step in determining if qualified immunity applies is to determine if, viewing the allegations in the light most favorable to plaintiffs, the facts show that defendants violated a constitutional right. *Id.* If so, the next step is to determine whether that right is clearly established. *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [person] that his conduct was unlawful in the situation he confronted." *Id.* at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). If the court determines that the right is clearly established, qualified immunity does not shield the public officials from liability. *Saucier*, 533 U.S. at 202. In *Saucier*, the Court considered the reasonableness of a police officer's action stating:

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular [action] is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Id.* at 205.

Plaintiffs' claims for lack of due process due to an insufficient petition, a violation of B.M.D.'s equal protection rights, and failure to train do not pass the first step in the Court's inquiry as the Court has previously determined that the individual defendants are entitled to summary judgment on those claims. As to the remaining constitutional claims, the plaintiffs'

rights are clearly established. In regard to plaintiffs' claim for false arrest, it is clear that an officer must have probable cause to legally arrest a person suspected of committing a crime. *See* U.S. Const. amend. IV. In regard to plaintiffs' claim for malicious prosecution, it is clear it is illegal for an officer to state deliberate falsehood or act with a reckless disregard for the truth while seeking a warrant. *See Ahlers v. Schebil*, 188 F.3d 365, 373 (6th Cir. 1999). Therefore, the individual defendants are not entitled to immunity for plaintiffs' claims of false arrest and malicious prosecution under § 1983.

## H.    State Law Claims

The state of Tennessee and government entities within the state are immune from actions brought against the state by its own citizens. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977); *see also Dixon v. Clem*, 492 F.3d 665, 673-74 (6th Cir. 2007). However, the Tennessee Governmental Tort Liability Act ("TGTLA") waives select portions of the absolute sovereign immunity enjoyed by government entities. *See* Tenn. Code Ann. § 29-20-201. If the TGTLA waives immunity for a government entity in regard to a certain type of claim, its employees are absolutely immune from suit in their individual capacities as to that claim. *Id.* at § 29-20-310(b ).

The TGTLA specifically states,

Immunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury arises out of: . . .false imprisonment, . . . false arrest, malicious prosecution, . . . infliction of mental anguish, . . . civil rights [or] the institution or prosecution of any judicial or administrative proceeding, even if malicious or without probable cause.

Tenn. Code Ann. § 29-20-205(2); (5). Where sovereign immunity is waived and a government entity can be held liable, the TGTLA gives state circuit courts exclusive original jurisdiction, Tennessee Code Annotated § 29-20-307, and it is appropriate for this Court to decline supplemental jurisdiction over those claims. *See Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000) (affirming the district court's dismissal of the TGTLA claims, stating, "in this instance, the Tennessee legislature expressed a clear preference that TGTLA claims be handled by its own state courts. This unequivocal preference of the Tennessee legislature is an exceptional circumstance for declining jurisdiction.").

Here, plaintiffs' state law claims are for false arrest and false imprisonment, malicious prosecution, reckless and/or negligent infliction of emotional distress, negligence, a violation of rights secured by the Tennessee Constitution, specifically unlawful seizure and the right to due process during the initiation of the prosecution, and violations of the Tennessee Human Rights Act. Plaintiffs' claims for reckless and/or negligent infliction of emotional distress and negligence are governed by the TGTLA, and as such, the Court declines to exercise supplemental jurisdiction over them. Additionally, because the TGTLA waives immunity for Knox County for these claims, the individual defendants are absolutely immune from suit in their individual capacities as to plaintiffs' state law claims for reckless and/or negligent infliction of emotional distress and negligence. However, plaintiffs' other state law claims are not governed by the TGTLA and, therefore, Knox County is immunity from suit but the individual defendants are not. The Court will therefore address each of plaintiffs' remaining individual-capacity state law claims in turn.

### 1.     False Arrest and False Imprisonment Under Tennessee Law

Under Tennessee law, for a plaintiff to successfully prosecute a claim of false arrest, he must prove: (1) the detention or arrest of one against his will, and, (2) the unlawfulness of such detention or restraint. *Coffey v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659 (Tenn. 1990). Similarly, false imprisonment requires the intentional restraint or detention of another without just cause. *Newson v. Thalhimer Bros., Inc.*, 901 S.W.2d 365, 367 (Tenn. Ct. App. 1994). Both the "unlawfulness" requirement of false arrest and the "without just cause" requirement of false imprisonment are defeated by a showing of probable cause. As previously discussed, there are genuine issues of material fact as to whether defendants Ragon and May had probable cause to arrest B.M.D. and summary judgment is not appropriate on these claims.

### 2.     Malicious Prosecution Under Tennessee State Law

A claim for malicious prosecution exists where: (1) a civil or criminal action instituted against the plaintiff without probable cause, (2) with malice, and (3) the action is terminated in plaintiff's favor. *Roberts v. Fed. Express Corp.*, 842 S.W.2d 246, 247-48 (Tenn. 1992); *Ryerson v. Am. Sur. Co.*, 373 S.W.2d 436, 437 (Tenn. 1963). There are material facts in dispute in regard to whether defendants Ragon and May had any responsibility for the decision to charge B.M.D. Additionally, there are facts in dispute as to whether probable cause existed. *See* Part III.A. Therefore, summary judgment on this claim is inappropriate.

25

### 3. Violations of the Tennessee Constitution

Plaintiffs cannot states a claim for violation of the Tennessee Constitution against defendants Ragon and May because Tennessee does not recognize a private right of action for violation of the Tennessee Constitution. *Bowden Bldg. Corp. v. Tenn. Real Estate Comm'n*, 15 S.W.3d 434, 446 (Tenn. Ct. App. 1999) (citing *Cline v. Rogers*, 87 F.3d 176, 180 (6th Cir. 1996); *Lee v. Ladd*, 834 S.W.2d 323, 325 (Tenn. Ct. App. 1992)). Therefore, the plaintiffs' claims brought under the Tennessee Constitution must be dismissed.

### 4. Violation of the Tennessee Human Rights Act

Although plaintiffs do not claim that defendants violated a specific provision of the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.*, in their response to defendants' motions to dismiss they argue that they have stated a claim based upon the differences between B.M.D.'s treatment regarding investigation and arrest and the treatment of white students. [*See* Doc. 133.] The THRA simply "provide[s] for execution within Tennessee of the policies embodied in the federal civil rights statutes." *Lynch v. City of Jellico*, 205 S.W.3d 384, 399 (Tenn. 2006). It seeks to protect individuals from discrimination because of race, creed, color, religion, sex, age, or national origin. Tenn. Code Ann. § 4-21-101. As stated above, there is no evidence that B.M.D. was treated differently from a similarly situated person on the basis of his race. *See* Part III.D. Accordingly, summary judgment will be granted in favor of defendant's Ragon and May on this claim.

## IV.     Conclusion

For the reasons set forth herein, the Court finds that on the undisputed facts, all defendants are entitled to judgment as a matter of law on plaintiffs' claims for lack of due process due to an insufficient petition and a violation of B.M.D.'s equal protection rights. Defendants Ragon and May in their individual capacities are also entitled to judgment as a matter of law on plaintiffs' claim for failure to train.  Additionally, all of plaintiffs' state law claims will be dismissed as to defendant Knox County as it is either immune or the Court declines to exercise supplemental jurisdiction over the claims governed by the GTLA.  As to defendants Ragon and May in their individual capacities, plaintiffs' state law claims for reckless and/or negligent infliction of emotional distress and negligence are dismissed because defendants Ragon and May are immune, plaintiffs' claims for violations of the Tennessee Constitution are dismissed because there is no private right of action, and defendants Ragon and May are entitled to judgment as a matter of law as to plaintiffs' claims for violations of the THRA.  Summary judgment is not appropriate as to all other claims.

Accordingly, Defendants Winston Ragon and Allen May's Motion for Summary Judgment [Doc. 92] and Defendant Knox County's Motion for Summary Judgment [Doc. 94] are hereby **GRANTED** in part and **DENIED** in part; and Plaintiffs' Motion for Partial Summary Judgment [Doc. 97] is hereby **DENIED**.  Plaintiffs' claims for lack of due process due to an insufficient petition, a violation of B.M.D.'s equal protection rights, and all state law claims are hereby **DISMISSED** against Knox County, and plaintiffs' claims for lack of due process due to an insufficient petition, a violation of B.M.D.'s equal protection rights,

27

failure to train, reckless and/or negligent infliction of emotional distress, negligence, violations of the Tennessee Constitution, and violations of the THRA are hereby **DISMISSED** against the individual defendants.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE